**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

**EDWIN RAMOS, et al.,**

**Plaintiffs,**

**v.**                                                    **CIVIL NO. 14-1722 (GAG)**

**JOSE VIZCARRONDO, et al.,**

**Defendants.**

## OPINION AND ORDER

On August 1, 2014, Edwin Ramos ("Plaintiff"), brought this employment discrimination action in the Puerto Rico Court of First Instance against José R. Vizcarrondo ("Vizcarrondo-Carrión"), Linda Lebber Johnson ("Lebber"), José A. Vizcarrondo ("Vizcarrondo-Toro"), Julio E. Vizcarrondo-Ramírez ("Vizcarrondo-Ramírez"), and Nellie Carrión de Vizcarrondo ("Carrión de Vizcarrondo"), all in their personal capacities and with their respective conjugal partnerships; DM Group LLC; SMPC LLC; Metropolitan Builders LLC; Resort Builders LLC; VMV Enterprises Corporation; Desarrollos Metropolitanos LLC; 3V LLC; Monterrey Leasing LLC; TP Two LLC; Treasure Point LLC; Desarrollos Metropolitanos S.E.; Resort Builders, SE, Metropolitan Builders, S.E.; Desarrollow Metropolitanos, Inc.; Metropolitan Builders, Inc.; Institutional Builders, S.E.; Omega Vistamar S.E.; DMI Pension Plan Inc.; Banco Popular de Puerto Rico ("BPPR") and its management; and José Nolla, Esq. ("Nolla") in his personal and official capacity in representation of Nolla & Palou P.S.C.  Defendants later removed this case to this court pursuant to 28 U.S.C. §§ 1331 and 1441.

Plaintiff claims that Defendants discriminated against him because of his gender and age in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621-623; Title

Civil No. 14-1722 (GAG)

VII of the Civil Rights Act of 1964, 42 U.S.C. §2000; the Americans with Disability Act ("ADA"), 42 U.S.C § 1201; the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132; Puerto Rico Law No. 17 of April 22, 1988, P.R. Laws Ann. tit. 29, §§ 155 *et seq.* ("Law 17"); Puerto Rico Law No. 115 of 1988, P.R. Laws Ann. tit. 29, §194 ("Law 115"); Puerto Rico Law No. 65 of 1986, P.R. Laws Ann. tit. 29, § 185b ("Law 65"); Puerto Rico Law No. 69 of 1985, P.R. Laws Ann. tit. 29, § 1340 ("Law 69"); and Puerto Rico Law No. 80 of May 30, 1976, P.R. Laws Ann. tit. 29, § 185 ("Law 80"). (See Docket No. 9-1.) Plaintiff essentially claims that Defendants in some way contributed to the unlawful and unconstitutional discrimination against him that terminated his employment. (Id.)

Presently before the court is Defendants' motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). (Docket No. 29.)

I.      Relevant Factual and Procedural Background

In 2001, Plaintiff applied for employment at BPPR and was scheduled for an interview. (Docket No. 9-1 ¶ 2.) Plaintiff was referred to the group of the defendant companies led by Vizcarrondo-Ramírez. (Id.) Vizcarrondo-Ramírez, as managing partner, interviewed Plaintiff and made an offer of employment which Plaintiff accepted. (Id. ¶ 3.) Plaintiff then worked for Vizcarrondo-Ramírez and the defendant companies from October 15, 2001 to April 11, 2013. (Id. ¶ 6.) Plaintiff's compensation included a medical insurance plan, a bonus of no less than one month's salary, vacations accrued at a rate of 1.25 days for every 110 work hours, sick leave accrued at a rate of 1.15 days for every 110 work hours, short and long term non-occupational disability insurance, a weekly car wash, immediate participation in a Defined Benefit Plan, and other benefits. (Id.) In his twelve years of working for the defendant companies, Plaintiff never received any negative comments and his work was always praised. (Id. ¶ 35.) For some of the

Civil No. 14-1722 (GAG)

years Plaintiff worked for the defendant companies, he also attended law school.  (See ¶¶ 10, 40.)
He was a hard-working and dedicated employee who contributed to the economic growth of the
companies.  (Id. ¶ 38.)  At the end of 2005, when Plaintiff concluded his legal studies, he was
offered a guaranteed salary of $120,000 per year to remain as an employee and remove himself
from the employment market.  (Id. ¶ 10.)  It was then that his "employer"[1] offered to pay for a
vehicle that Plaintiff had recently purchased.  (Id.)  Thereafter, in December, 2007, Plaintiff and
his wife purchased the residence in which they currently reside, at which point "the employer"
assured Plaintiff he need not worry about his position because he would remain an employee of the
company until they ran out of business which was unlikely.  (Id. ¶ 71.)

During the summer of 2008, Plaintiff began studying for the Puerto Rico Bar and, upon
realizing that he needed more time to study, he met with his employers.  (Id. ¶ 41.)  Plaintiff met
with Vizcarrondo-Ramírez, Vizcarrondo-Carrión, and Vizcarrondo-Toro and asked them for time
off to study for the bar.  (Id.)  In response, Vizcarrondo-Ramírez and Vizcarrondo-Toro offered
their unconditional support and authorized Plaintiff to take time for his studies as leave that would
not affect his vacation time.  (Id.)  However, Vizcarrondo-Carrión immediately objected, stating
that Plaintiff was better off taking his "severance and going to hell."  (Id. ¶ 43.)  Nevertheless,
Vizcarrondo-Ramírez allowed Plaintiff to take paid leave to study.  (Id.)  Between the years 2009
and 2011, Vizcarrondo-Carrión insinuated on several occasions that he did not want Plaintiff in his
company.  (Id. ¶ 79.)  For example, in 2008, after the change in Puerto Rico government,
Vizcarrondo-Carrión told Plaintiff that because of the change in government no one could do
anything to him, that he was going to remove Plaintiff from his employment, and that it would be
better if Plaintiff left and saved himself the suffering.  (Id.)

---

[1] The court notes that at no point in the complaint does Plaintiff specify who is "the employer."  The court
will assume that Plaintiff is referring to the defendant companies of which he was employed.

Civil No. 14-1722 (GAG)

Thereafter, in July, 2010, the "the President" told Plaintiff that he was carrying out an investigation of all employees, especially Pablo López.  (Id. ¶ 44.)  "The President" hired Saint James Security Company's services to investigate and find out whether money or property was being stolen from within the company.  (Id. ¶ 45.)   Vizcarrondo[2] told Plaintiff that the investigation involved monitoring telephone calls, e-mails, and other related activities.  (Id. ¶ 46.) Plaintiff told Vizcarrondo that the investigation seemed to involve illegal activity, and that such manners should be handled by the police.  (Id. ¶ 47.)  For the investigation, Vizcarrondo-Carrión also hired the services of Nolla and his law firm, Nolla, Palau & Casellas.  (Id. ¶ 48.)  Nolla and his law firm advised Vizcarrondo-Carrión and led the investigation that culminated with Pablo López's termination in October, 2010.  (Id.)   After Pablo López's termination, Nolla pressured Plaintiff, insinuating that he would be the next employee to be terminated.  (Id. ¶ 49.)

In January, 2011, Vizcarrondo-Carrión called Plaintiff into a meeting with Nolla to discuss the results of Pablo López's final interview and his termination settlement.  (Id. ¶¶ 50, 55.)  At this meeting, Plaintiff and Nolla disagreed on whether all employees were entitled to Law 80 compensation.[3]  (Id. ¶ 51.)   Nolla argued that not all employees were entitled to Law 80 compensation, using Plaintiff as an example.  (Id.)  Plaintiff disagreed.  (Id. ¶ 52.)  Nolla then told Plaintiff "you beat me with regards to the contract and compensation, but you are not beating me with regards to Law 80.  We will go to the end with this, and I will take the case for free."  (Id. ¶ 54.)

---

[2] The court notes that Plaintiff often alternates the names of Defendants making it impossible for the court to decipher who Plaintiff is referring to at certain times in the complaint.

[3] Generally speaking, Law 80 requires employers to compensate at-will employees who are discharged without just cause.  Ruiz-Sánchez v. Goodyear Tire & Rubber Co., 717 F.3d 249, 254 (1st Cir. 2013).  Specifically, the law entitles such employees to receive a severance known as "mesada," which is calculated according to a formula based on the employee's salary and years of service.  Id.; Otero-Burgos v. Inter Am. Univ., 558 F.3d 1, 7-9 (1st 2009). Section 185b describes the reasons that constitute just cause for termination of an employee.  If an employee is discharged for one of these reasons, the employer will escape liability under Law 80.  See P.R. Laws. Ann. tit. 29, §§ 185a-185b.

Civil No. 14-1722 (GAG)

The next incident took place on March 3, 2011, when Nolla notified Plaintiff that a $250,000 compensation would suit him, that Plaintiff should not have to sue, and that Nolla would be able to make it so that Plaintiff's compensation was not taxed.  (Id. ¶ 59.)  In light of the lack of any employment relationship between Nolla and Plaintiff, Plaintiff could not understand how Nolla could decide and determine his employment, and offer any sort of compensation.  (Id. ¶ 60.)  A few days later, when Plaintiff told Vizcarrondo-Toro about his conversation with Nolla, Vizcarrondo-Toro suggested he speak with Vizcarrondo-Ramírez about the situation because he believed Nolla's actions involved Vizcarrondo-Carrión.  (Id. ¶ 62.)  Plaintiff then spoke directly with Vizcarrondo-Carrión who claimed he had nothing to do with Plaintiff's conversation with Nolla.  (Id. ¶ 63.)  Vizcarrondo-Carrión went on to say that Nolla was employee Ismael Sanchez's friend, and that maybe Ismael Sánchez was somehow involved.  (Id.)  Plaintiff also told Vizcarrondo-Carrión that if he was not wanted in the company he would accept his Law 80 compensation and be on his way.  (Id.)

Near the end of March, 2011, Vizcarrondo-Carrión informed Plaintiff that a group of employees were going to be "suspended," a term that he used to avoid using the word "terminated."  (Id. ¶ 81.)  The employees dismissed included Richard López ("López"), whose brother was Pablo López, the employee fired as a result of the previously-mentioned investigation. (Id. ¶ 82.)  López was the only employee, aside from Plaintiff, that was terminated without his Law 80 compensation.  (Id. ¶ 84.)  Thus, Plaintiff alleges that López was terminated in retaliation for his brother's actions.  (Id. ¶ 85.)  Then, at a meeting in December, 2011, individuals witnessed the hostile and disrespectful way in which Vizcarrondo-Carrión treated Plaintiff.  (Id. ¶ 77.)

As a result of the aforementioned events, Plaintiff had to visit a Cardiologist.  (Id. ¶ 78.) Plaintiff's cardiologist was later contacted by Plaintiff's "employer" who asked for information

Civil No. 14-1722 (GAG)

regarding Plaintiff's health.  (Id.)  Thereafter, upon request from the cardiologist herself, Plaintiff stopped visiting her.  (Id.)  Also towards the end of 2011, the work pressures began to affect Plaintiff's health, causing a spasm in his lower back.  (Id. ¶ 56.)  Plaintiff alleges it was a physical manifestation of the stress and pressures he was being exposed to at work.  (Id.)  Plaintiff's blood pressure has also increased to dangerous levels.  (Id. ¶ 57.)

Thereafter, during April, 2012, Plaintiff requested two vacation days to deal with some personal matters.  (Id. ¶ 73.)  No one, except Plaintiff and his wife, knew that he was in fact attending a study program at the Atlanta John Marshall School of Law on "Labor and Employment Law."  (Id. ¶ 74.)  When Plaintiff returned from his trip, the Vizcarrondos[4] began to make insinuations about the program.  (Id.)  For example, on one occasion, Vizcarrondo-Toro told Plaintiff that the program would not help Plaintiff because Vizcarrondo-Carrión no longer wanted Plaintiff in the company.  (Id. ¶ 75.)  Plaintiff believes that the only way the Vizcarrondos could have known about his trip was if they had illegally monitored him.  (Id. ¶ 76.)

Additionally, Plaintiff discovered through a colleague that Ismael Sánchez had been making defamatory statements about Plaintiff, alleging that Plaintiff had taken money from the company and he would be fired as a result.  (Id. ¶ 64.)  When Plaintiff approached Ismael Sánchez in July, 2012, Sánchez stated he was sorry and that Vizcarrondo-Carrión approached and ordered Ismael Sánchez to spread those allegations around.  (Id. ¶ 69.)  Later that year, in December, 2012, one of the employer's subcontractors asked Plaintiff whether Plaintiff had access to transfer $500,000 whenever he wished.  (Id. ¶ 65.)  Plaintiff responded by saying that he did not, and that having such access was impossible given his position in the company.  (Id.)  Based on these two incidents, Plaintiff alleges that the employer was spreading false information about him in order to

---

[4] Once again, the court notes that Plaintiff's continued lack of clarity does not allow the court to determine if he is referring to all three defendants with the same last name, or only two of them.

Civil No. 14-1722 (GAG)

"annihilate" his reputation, fire him, and discredit him so that no other employer would want to hire him.  (<u>Id.</u> ¶ 67.)

The next incident occurred during January, 2013.  (<u>Id.</u> ¶ 99.)  Every January, Plaintiff called the Starbuilder support system (an accounting program) to ask that they guide him in certain matters giving way to the new calendar year.  (<u>Id.</u> ¶ 100.)  In January, 2013, Plaintiff tried to contact the support system via e-mail and telephone, but was unsuccessful.  (<u>Id.</u>)  Then, on January 28, 2013, he received a call from the Starbuilder support system notifying him that he was no longer authorized to take any actions with regards to the Starbuilder system.  (<u>Id.</u>)  The employers had taken away Plaintiff's responsibilities with regards to investments, lines of credit, and bank reconciliations.  (<u>Id.</u> ¶ 99.)  Plaintiff alleges he was being constructively dismissed by being deprived of his responsibilities.  (<u>Id.</u> ¶ 100.)

Plaintiff then sent an email to the Vizcarrondos complaining about his rights regarding the harassment and the hostile atmosphere to which he was being subjected.  (<u>Id.</u> ¶ 94.)  Vizcarrondo-Ramírez and Vizcarrondo-Toro met with Plaintiff and informed him that he had to either fire two employees, or keep the two and fire Mr. Tito Vázquez, who was in charge of payroll.  (<u>Id.</u> ¶ 101.)  When Plaintiff refused to do either, he was told he should go find work elsewhere because they were terminating him.  (<u>Id.</u> ¶ 102.)  Plaintiff then asked Vizcarrondo-Ramírez and Vizcarrondo-Toro to give him the termination notice in writing, and to inform him with regards to his accrued pension plan value.  (<u>Id.</u> ¶¶ 102-103.)  They refused.  (<u>Id.</u>)  However, at the conclusion of said meeting, Vizcarrondo-Ramírez and Vizcarrondo-Toro told Plaintiff to forget what had been discussed because nothing was happening in regards to his employment.  (<u>Id.</u> ¶ 104.)

After being terminated, López had filed a complaint in federal court under the ADEA and other statutes, and his complaint was referred to Nolla's law firm.  (<u>Id.</u> ¶ 87.)  As a result, Nolla

**Civil No. 14-1722 (GAG)**

asked Plaintiff to sign some statements, but Plaintiff refused because he believed the statements were untruthful.  (Id.)  Plaintiff also sent an e-mail to Nolla, which was copied to "the employers," stating that Nolla's theory of López's case was far from the truth, and that Plaintiff refused to endorse Nolla's theory and documents.  (Id. ¶ 88.)  Nolla then named Plaintiff as a witness in federal Court, and Plaintiff again refused to participate in the case.  (Id. ¶ 89.)  In March, 2013, when Plaintiff received his second bonus payment was, Nolla called Plaintiff and said that now Plaintiff was going to testify and "help us" because he was paid his bonus and should be happy. (Id.)

On another occasion, Vizcarrondo-Toro entered Plaintiff's office and began asking Plaintiff about the weekly cash flow report that was used to plan weekly cash requirements.  (Id. ¶ 90.) Plaintiff was answering the question from in front of his computer screen when Vizcarrondo-Toro approached on Plaintiff's left side and began moving his hips creating physical contact between Plaintiff's forearm and his genitals.  (Id. ¶ 91.)  Plaintiff immediately got up angrily from his chair and forcefully rejected Vizcarrondo-Toro's improper action.  (Id. ¶ 92.)  Vizcarrondo-Toro stated that Vizcarrondo-Carrión had asked him to do it.  (Id.)   Plaintiff immediately notified Mr. Vizcarrondo-Carrión of what had occurred, to which Vizcarrondo replied that he already knew because a secretary had seen what had happened.  (Id. ¶ 93.)  Plaintiff, in accordance with the company's policy against sexual harassment, reported the incident and gave the name of the witnesses, but nothing was done.  (Id.)

Finally, on April 8, 2013, Plaintiff arrived at work to find a document from Vizcarrondo-Carrión informing Plaintiff that his salary would be reduced by $400 per month.  (Id. ¶ 7.) Vizcarrondo-Carrión had previously mentioned he would reduce salaries and eliminate the medical plan.  (Id. ¶ 11.)  Plaintiff then sent an e-mail expressing his concerns as to the salary reduction and

8

Civil No. 14-1722 (GAG)

medical plan elimination, and reminding Vizcarrondo-Carrión of the guaranteed salary they had agreed to back in 2005.  (Id. ¶¶ 11-13.)  The President responded by stating "We can't do that. I don't have money."  (Id. ¶ 11.)  Plaintiff pointed out that three employees received raises, when no one else had received a raise whatsoever since 2008.  (Id. ¶ 12.)  Plaintiff then met with Vizcarrondo-Carrión to discuss his salary reduction, and Vizcarrondo-Carrión informed Plaintiff that his salary was too expensive for the employer to maintain, that they could no longer guarantee it, and that his services were no longer needed.  (Id. ¶¶ 14, 18.)  Further, Vizcarrondo-Carrión informed Plaintiff that they could no longer afford to pay him his benefits accrued in his retirement plan.  (Id. ¶ 21.)  Vizcarrondo-Carrión also expressed that they were exploring alternatives such as having Plaintiff be self-employed and acquiring his services in that way.  (Id.)  Plaintiff responded by stating that if they paid him his severance, his accrued benefits and wages, and his pension plan assets, he would provide his professional services as self-employed.  (Id.)  Vizcarrondo-Carrión replied that he would not pay Plaintiff more than $50 per hour which is what Vizcarrondo-Carrión claims Plaintiff was worth.  (Id.)  Plaintiff then expressed concern for his rights.  (Id. ¶ 22.)  He asked whether his rights would be respected because it seemed that his employers were unilaterally amending his contract, from an indefinite period to a definite one, refusing to pay his pension plan rights and his accrued unpaid benefits.  (Id.)  Vizcarrondo-Toro assured him that his rights would be respected.  (Id. ¶ 23.)

At this meeting, Vizcarrondo-Toro explained that the reason behind the companies' lack of capital was that although previously the group of companies had benefitted from a great deal of work, at the moment they only had the personal capital they had accumulated for the past forty plus years.  (Id. ¶ 20.)  However, Plaintiff alleges that the true reason for the sudden reduction in capital was a dispute amongst the owners.  (Id.)  He also alleges that the companies had a great

Civil No. 14-1722 (GAG)

deal of contracts at the estimate stage that would at some point lead to contracts with the group of companies.  (Id.)  During the meeting, Plaintiff expressed that under such circumstances, as a result of the undue pressure exercised on him and taking into consideration the aforementioned events, the fairest thing to do would be to pay him his severance and allow him to be on his way to find other employment.  (Id. ¶ 24.)

Vizcarrondo-Carrión agreed to the Plaintiff's proposal and proceeded to ask Plaintiff how much they were to pay him.  (Id. ¶ 25.)  In response, Plaintiff said that he needed to make some calculations.  (Id. ¶ 25.)  Thus, around 12:30pm the meeting ended.  (Id.)  Plaintiff left with the understanding that they would pay his severance in order to bring an end to the working relationship on that same day, April 8, 2013.  (Id. ¶ 26.)  Plaintiff went to his office, prepared his severance calculations as established by Law 80, which amounted to approximately $123,000, and forwarded those calculations along with the calculations for his accrued vacations that same day around 1:46pm.  (Id. ¶ 27.)  Plaintiff then gathered his belongings, prepared the accrued vacation check, and placed the check in the outbox.  (Id. ¶ 29.)  Plaintiff waited until approximately 3:55pm, then emailed "the three Vizcarrondos" (Vizcarrondo-Carrión, Vizcarrondo-Toro, Vizcarrondo-Ramírez) asking them to send his payments by mail.  (Id. ¶ 32.)

Plaintiff alleges he had no choice but to leave his employment in order to preserve his health and safety.  (Id. ¶ 33.)  He felt ashamed, and claims the end of his employment was all a result of his not agreeing with his employers' illegal, abusive, and unjust actions.  (Id.)  Plaintiff alleges that defendants acted intentionally when they systematically discriminated against him and any other employee who was over forty years old.  (Id. ¶ 34.)  Plaintiff also alleges that Nolla participated in and encouraged Plaintiff's termination because Plaintiff opposed and refused to cooperate with the case against López.  (Id. ¶ 23.)  After Plaintiff left his employment, Natalia

10

Civil No. 14-1722 (GAG)

Galindo, a young female CPA, went on carrying out the duties of Plaintiff's now vacant position. (Id. ¶ 37.)

On November 4, 2013 Plaintiff filed the corresponding complaint before the Puerto Rico Antidiscrimination Unit.  (Id. ¶ 96.)  He later amended it and received the corresponding right to sue letter on May 15, 2014.  (Id.)

## II.    Standard of Review for a Motion for Judgment on the Pleadings

When considering a motion for judgment on the pleadings, Rule 12(c) of the Federal Rules of Civil Procedure states that "after the pleadings are closed–but early enough not to delay trial–a party may move for judgment on the pleadings."  FED. R. CIV. P. 12(c).  Courts must analyze a Rule 12(c) motion under the same standard as applied to Rule 12(b)(6) motions to dismiss. Marrero-Gutierrez v. Molina, 491 F.3d 1, 5 (1st Cir. 2007).

The court analyzes the complaint in a two-step process under the current context-based "plausibility" standard established by the Supreme Court.  See Schatz v. Republican State Leadership Comm., 669 F.3d 50, 55 (1st Cir. 2012) (citing Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 12 (1st Cir. 2011) which discusses Ashcroft v. Iqbal, 556 U.S. 662 (2009) and Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007)).  First, the court must "isolate and ignore statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements."  Id.  A complaint does not need detailed factual allegations, but "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Iqbal, 556 U.S. at 678-79.  Second, the court must then "take the complaint's well-pled (i.e., non-conclusory, non-speculative) facts as true, drawing all reasonable inferences in the pleader's favor, and see if they plausibly narrate a claim for relief."  Schatz, 669 F.3d at 55.  Plausible, means something more than merely possible, and gauging a pleaded situation's plausibility is a context-

**Civil No. 14-1722 (GAG)**

specific job that compels the court to draw on its judicial experience and common sense.  Id. (citing Iqbal, 556 U.S. at 678-79).  This "simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of" the necessary element.  Twombly, 550 U.S. at 556.

"[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'"  Iqbal, 556 U.S. at 679 (quoting FED. R. CIV. P. 8(a)(2)).  If, however, the "factual content, so taken, 'allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged,' the claim has facial plausibility."  Ocasio-Hernández, 640 F.3d at 12 (quoting Iqbal, 556 U.S. at 678).

### III.    Discussion

In moving to dismiss, Defendants argue that the complaint fails to state a claim upon which relief can be granted because: (1) there is no individual liability under the ADEA, Title VII, and the ADA; and (2) Plaintiff's claims under the ADEA, Title VII, the ADA, and Puerto Rico Laws 100, 69, and 17 are time-barred because they were not properly exhausted before the Puerto Rico Antidiscrimination Unit ("ADU").  (See Docket No. 29 at 6.)  In response, Plaintiff argues that letters exchanged via email between Plaintiff and the Defendants on May 24, 2013, tolled the statute of limitations on all claims.  (See Docket No. 44 at 1.)

A.    Individual Liability

The court first addresses the issue of individual liability with respect to Plaintiff's Title VII, ADEA, and ADA claims.  In moving to dismiss, Defendants argue that Title VII, the ADEA, and the ADA do not provide for individual liability.  (Docket No. 29 at 17.)  Indeed, the First Circuit has established that the statutory scheme of Title VII itself indicates that Congress did not

Civil No. 14-1722 (GAG)

intend to impose individual liability on employees.  See Fantini v. Salem State College, 557 F.3d 22, 28 (1st Cir. 2009).  It is also well-settled that there is no individual liability under Title I of the ADA.  See Román-Oliveras v. P.R. Elec. Power Auth., 655 F. 3d 43, 52 (1st Cir. 2011).

Additionally, there is no individual liability under the ADEA, as only the employer is liable for the acts of its agents.  See Correa-Ruiz v. Calderon-Sierra, 411 F. Supp. 2d 41, 47 (D.P.R. 2005); see also Vizcarrondo v. Bd. Of Trustees, 139 F. Supp. 2d 198, 205 (D.P.R. 2001); see also Rodriguez v. Puerto Rico Marine Mgmt., In., 975 F. Supp. 115, 120 (D.P.R. 1997); see also Moreno v. John Crane, 963 F. Supp. 72, 76-77 (D.P.R. 1997).   Lastly, it is well-settled that there is no individual liability under Puerto Rico Law 80.  See Reyes-Ortiz v. McConnell Valdes, 714 F. Supp. 2d 234, 238 (D.P.R. 2010) (citing Flamand v. Am. Intern. Group, 876 F. Supp. 356, 364 (D.P.R. 1994); see also Velez Nievez v. Microsoft Caribbean, Inc., No. 05-1067, 2006 WL 1805689, at *7-8 (D.P.R. Mar. 15, 2006); see also Miro Martinez v. Blanco Velez Store, Inc., 393 F. Supp. 2d 108, 113 (D.P.R. 2005).

Accordingly, Plaintiff's claims against the co-defendants under Title VII, the ADA, the ADEA, and Puerto Rico Law 80 in their individual capacities are hereby **DISMISSED with prejudice**.

### B.   Timeliness of Federal Discrimination Claims

The court next turns to Defendants argument that the allegations in the complaint that were brought for the first time in the supplemental charge of Plaintiff's amended EEOC filing must be dismissed as time-barred.  Under Title VII, Title I of the ADA, and the ADEA a plaintiff must file an employment discrimination charge with the EEOC within 300 days of the alleged discrimination.  Rivera-Rodriguez v. Frito Lay Snacks Caribbean, 265 F.3d 15, 21 (1st Cir. 2001) *abrogated on other grounds by* Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002).

Civil No. 14-1722 (GAG)

1  Pursuant to its rulemaking authority under 42 U.S.C. § 2000e-16(b), the EEOC has promulgated

2  regulations encompassing a highly structured set of steps that must be taken by the agency and the

3  aggrieved party as the complaint process proceeds.  Velázquez-Ortíz v. Vilsack, 657 F.3d 64, 71

4  (1st Cir. 2011).  This process requires the complainant to, inter alia, file a complaint with the

5  relevant agency.  See 29 C.F.R § 1614.106(a).  In Puerto Rico, the employee must file a charge

6  with the EEOC or Puerto Rico's ADU within 300 days from the alleged discrimination.  See 42

7  U.S.C.A. § 2000e; Bonilla v. Muebles J.J. Alvarez, Inc., 194 F.3d 275, 278 n.4 (1st Cir. 2003);

8  Cintrón-García v. Supermercados Econo, 818 F. Supp. 2d 500, 506-507 (D.P.R. 2011).  The

9  complaint must contain a statement describing generally the actions or practices that form the basis

10 of the complaint.  Velázquez-Ortíz, 657 F.3d at 71.  In addition to filing a timely complaint with

11 the EEOC, a plaintiff must receive a right to sue letter.  Id.

12                          i.    The Original Charge Filed with the EEOC

13         To analyze the Defendants' claim, the court first turns to Plaintiff's charge filed with the

14 ADU and the EEOC on November 4, 2013.  Defendants concede that Plaintiff's original charge

15 was filed in a timely manner.  (Docket No. 29 at 11.)  In his November 4, 2013 charge, Plaintiff

16 claimed that he was filing under Law 100, and the ADEA.  (Docket 29-1.)[5]  The allegations in said

17 charge allege that Defendants terminated him from his employment in retaliation for having

18 refused to sign documents involving the termination of another employee.  (Id.)  Specifically, the

19 charge outlines the claims Plaintiff alleges in his complaint to this court with respect to López's

20 dismissal and Plaintiff's refusal to cooperate with his employers when López filed a discrimination

21 charge.  (See id.)  Because Plaintiff alleges that Defendants constructively terminated him from his

---

22
23       [5] Exceptions to the rule barring a court from considering exhibits in a motion to dismiss include: (1) when a
   documents' authenticity is not in dispute; (2) when the documents are central to plaintiff's claim; or, (3) when
   documents are sufficiently referred to in the complaint.  Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993).  The EEOC
24 charge filings are not in dispute, they are central to Plaintiff's claim, and Plaintiff refers to them in the complaint.  (See
   Docket No, 9-1 ¶ 96.)  As such, the court probably considers the EEOC charge at this stage in the litigation.

Civil No. 14-1722 (GAG)

employment on April 11, 2013 and thereafter filed the initial charge within 207 days of the alleged adverse employment action creating notice that Plaintiff was filing under Law 100 and the ADEA, including factual allegations of discrimination in the form of retaliation, said filing was made in a timely manner and thus is not time-barred.

ii.   *The Supplemental Charge Filed with the EEOC*

The court now turns to Plaintiff's claims alleged in his supplemental charge with the EEOC on April 23, 2014.  (See Docket Nos. 9-1 ¶ 96; 29-2.)  By filing on April 23, 2014, Plaintiff's supplemental charge was filed with the EEOC 377 days after the alleged adverse employment action.  Plaintiff's supplemental charge includes a plethora of factual allegations not included in his original charge brought under Law 115, 69, Title VII, sections 703 and 704 of the ADA and the ADEA, and Puerto Rico Law 17.  (Docket No. 29-2.)  Due to the fact that the supplemental charge was filed 377 days after the adverse employment action occurred, it failed to meet the 300 day-requirement of filing a charge with the EEOC.  See Rivera-Rodriguez, 265 F.3d at 21.

However, EEOC regulations allow "written statements" of fact to amend a charge, but only insofar as they "cure technical defects or omissions, including failure to verify the charge, or to clarify and amplify allegations made therein.  Such amendments and amendments alleging additional acts which constitute unlawful employment practices related to or growing out of the subject matter of the original charge will relate back to the date the charge was first received.  29 C.F.R. § 1601.12(b) (Title VII); cf. 29 C.F.R. § 1626.8 (establishing similar requirements for EEOC charges alleging violations of the ADEA).   Further, a charge that has been so amended shall not be required to be redeferred.  29 C.F.R. § 1601.12(b).  Thus, the court must, in essence, determine whether the additional acts Plaintiff is alleging in his supplemental charge relate to or grow out of the subject matter of the original charge.

15

Civil No. 14-1722 (GAG)

The court's research on this matter reveals that the First Circuit has not previously weighed in on the issue of whether a supplemental charge with additional legal theories filed after the 300 day period relates back to the original filing.  Nevertheless, other circuits have addressed it and have arrived at differing results.  Defendants argue that amendments that raise a new legal theory do not relate back to an original charge of discrimination.  (Docket No. 29 at 14.)  They cite a Fifth Circuit decision holding that a racial discrimination supplemental charge filed with the EEOC more than 300 days after the discriminatory act took place did not relate back to the original timely charge alleging discrimination based on sex.  See Equal Emp't Opportunity Comm'n v. Miss. Coll., 626 F.2d 477, 483-84 (5th Cir. 1980).  As such, that court held that allegations of racial discrimination do not relate or grow out of allegations of sex discrimination.  Id. at 484. Additionally, they cite a Seventh Circuit decision holding that a disability discrimination charge could not relate back to the date of the filing of an age discrimination charge where the plaintiff did not make any factual allegations regarding age discrimination in his original charge.  See Fairchild v. Forma Scientific, Inc., 147 F.3d 567, 575-76 (7th Cir. 1998).

Furthermore, the Fourth Circuit has denied the relation back of an age discrimination charge filed as a supplemental charge to an original charge of discrimination on the basis of sex, stating that age discrimination does not necessarily flow from sex discrimination because Title VII and ADEA claims arise from completely distinct statutory schemes.  See Evans v. Tech's Applications & Serv. Co., 80 F.3d 954, 963 (4th Cir. 1996).  Likewise, the Ninth Circuit has rejected the argument that age discrimination arose from the same subject matter as a claim of discrimination based on national origin because Title VII and ADEA claims arise from distinct statutory schemes and the original charge contained no hint of age discrimination.  See Pejic v. Hughes Helicopters, Inc., 840 F.2d 667, 675 (9th Cir. 1998).  Following this case, the Ninth

Civil No. 14-1722 (GAG)

Circuit has attempted to reduce the strict construction of EEOC charges by requiring courts to construe appellants' EEOC charges with utmost liberality because they are made by those unschooled in the technicalities of formal pleading.  See Lyons v. England, 307 F.3d 1092, 1104 (9th Cir. 2002).

However, other courts have allowed amendments raising a new legal theory to relate back to an original charge of discrimination.  For example, the Eighth Circuit has allowed racial discrimination charges to relate back to the date of a sex discrimination charge.  Washington v. Kroger Co., 671 F.2d 1072, 1075-76 (8th Cir. 1982).  In another case, within the Fifth Circuit, that court allowed a national origin discrimination charge to relate back to the date of a sex discrimination charge because the charging party had failed to attach the correct legal conclusion but had, nevertheless, made factual allegations pertaining to such a claim.  See Sanchez v. Standard Brands, Inc., 431 F.2d 455, 464 (5th Cir. 1970).

Turning to the present case, when Plaintiff filed his original charge, the form he signed included an area for checking all applicable law for his factual allegations.  (See Docket 29-1.)  However, Plaintiff only checked the space for "Law 100 of June 30, 1959, amended" and "Age Discrimination in Employment Act of 1967," leaving unchecked "Title VII of the Civil Rights Act," "Americans with Disabilities Act of 1990," "Law 69 of July 6, 1985," and "Law 17 of April 22, 1988, amended."  (See id.)  The court finds an analogous situation in a Tenth Circuit case where the plaintiff failed to mark the box for the law underlying a claim he later alleged in his amended charge.  See Gunell v. Utah Valley State Coll., 152 F.3d 1253, 1260 (10th Cir. 1998).  In that case, the Tenth Circuit held that although a plaintiff's failure to mark the box for sex discrimination on the original EEOC charge form is not dispositive, it certainly creates a presumption that plaintiff was not asserting claims represented by the boxes not checked.  See id.

17

Civil No. 14-1722 (GAG)

Furthermore, Plaintiff's original charge reads in its closing sentences: "The employers tried to use me for other cases where I also refused to sign documents since they contained false statements that they pretended appear under oath. In reprisal to this was that I was dismissed." (Docket No. 29-1.) As such, not only did Plaintiff fail to check the box for the underlying applicable law in his original charge, but he also failed to plead any allegations that pointed to anything other than a retaliation charge. In sum, Plaintiff's original charge recites few facts and alleges only a claim of retaliation.

As noted above, the regulation states that an amendment will relate back to an original charge when it alleges additional acts related to or growing out of the same subject matter of the original charge. See 29. C.F.R. § 1601.12(b) (Title VII); cf. 29 C.F.R. § 1626.8 (establishing similar requirements for EEOC charges alleging violations of the ADEA.) Thus, for example, if Plaintiff had alleged that he was fired on the basis of a disability, he could have later amended his charge to add specific allegations of how he did not receive applicable compensation because of his disability. These would have been two acts growing out of the same subject matter. However, Plaintiff alleges additional bases for legal liability, as opposed to a simple addition of acts that constitute unlawful practices.

Addressing a similar situation, the Seventh Circuit stated that even if the court were to read the term "acts" in the regulation broadly, the plaintiff would still need to convince the court that the "additional act" of disability discrimination was "related to" or grew out of the age discrimination charge. See Fairchild, 147 F.3d at 575. Here, Plaintiff did not simply fail to articulate correctly the legal conclusion emanating from the factual allegations in his original charge because he made factual allegations that could only support one kind of adverse action: retaliation. Further, applying the reasoning from the numerous cases cited above, disability

18

Civil No. 14-1722 (GAG)

discrimination does not necessarily flow from age discrimination and retaliation because they arise from distinct statutory schemes.

Additionally, the policy underlying the federal employment discrimination law supports this outcome in the present circumstances.   The charge filing requirement ensures that the employer has adequate notice of the charges and promotes conciliation at the administrative level. See Schnellbaecher v. Baskin Clothing Co., 887 F.2d 124, 126 (7th Cir. 1989).  When Plaintiff filed his first charge, the ADU, the EEOC, and Defendants were on notice of a retaliation claim under the ADEA and Law 100.  Neither had reason to investigate or consider a sexual harassment claim, a disability claim, or any of the other claims Plaintiff later alleged in his supplemental charge.  Situations like this could hinder the EEOC's ability to launch and conduct appropriate investigations, and could possibly reduce the chances for conciliation.  See id.

Thus, allowing this belated charge to relate back to the original charge, absent any factual nexus to the original charge, would frustrate the purposes of the aforementioned administrative scheme.   Based on the court's reading of the regulation and understanding of the policies supporting the charge-filing requirement, the court finds that the claims in Plaintiff's supplemental charge do not relate back to the retaliation charge in his original charge filed with the EEOC. Consequently, Plaintiff's claims in the supplemental charge under Law 115, 69, Title VII, § 703-704 of the ADA and ADEA, and Law 17 of 1988 were filed outside the required 300 day period, and, as such, Plaintiff is precluded from now bringing these claims.

Plaintiff's untimely amendment, which alleged entirely new theories of recovery, does not relate back to a timely filed original charge.  Thus, the only claims that were timely filed were the claims under the ADEA and Law 100 claim, of which the court will address their plausibility below.

**Civil No. 14-1722 (GAG)**

Accordingly, the court **GRANTS** Defendants' motion for judgment on the pleadings at Docket No. 29 as to Plaintiff's claims under Law 115, 69, Title VII, Sections 703 and 704 of the ADA, and Law 17 of 1988 and **DISMISSES** said claims.[6]

C.   Plaintiff's Timely Filed Federal Claims

i.   *Discrimination Claim under the ADEA*

The court now turns to the plausibility of Plaintiff's discrimination claim under the ADEA. To start, the court notes that Plaintiff's original charge filed with the EEOC does not include factual allegations in support of an age discrimination claim under the ADEA. While Plaintiff may not have explicitly linked his discrimination to age, the fact that Plaintiff checked the ADEA box in the EEOC charge form is enough to infer that he claims that age was a basis of the charge he was filing with the EEOC.  See Jusino v. Sears Roebuck of P.R., Inc., No. 13-1138, 2013 WL 3821608, at *1, *4 (D.P.R. July 23, 2013).  Thus, the court finds that the factual allegations included in Plaintiff's supplemental charge with the EEOC and in the complaint relate back to Plaintiff's timely filing of claims under the ADEA in the original charge filed with the EEOC. Because the court finds that Plaintiff adequately exhausted administrative remedies regarding a claim under the ADEA of discrimination based on age, the court now turns to the merits of said claim.

With respect to the applicable law, the ADEA makes it unlawful for an employer to refuse to hire or discharge any individual or otherwise discriminate against any individual because of

---

[6] The court notes that Plaintiff argues that letters exchanged via email between Plaintiff and the Defendants on May 24, 2013, tolled the statute of limitations on all claims.  (See Docket No. 44 at 1.)  Generally speaking, although peculiar circumstances may leave some wiggle room, equitable tolling is not appropriate unless a claimant misses a filing deadline because of circumstances effectively beyond their control (such as when the employer actively misleads the employee, and he relies on that misconduct to his detriment).  See Bonilla v. Muebles J.J. Alvarez, Inc., 194 F.3d 275, 279 (1st Cir. 1999).  Here, Plaintiff has raised a tolling argument in his opposition to Defendants' motion but has advanced no developed argumentation in support of his claim.  Moreover, the complaint does not allege any facts that remotely suggest a plausible basis for such relief.

Civil No. 14-1722 (GAG)

such individual's age.  29 U.S.C. § 623(a)(1).  To obtain relief for age discrimination under the ADEA, a plaintiff must sufficiently allege that: (1) he was at least forty years old at the time of the alleged adverse employment action; (2) his job performance met or exceeded the employer's legitimate expectations; (3) his employer actually or constructively discharged him; and (4) his employer had a continuing need for the services he had been performing.  See id; see also Torrech-Hernandez v. Gen. Elec. Co., 519 F.3d 41, 48 (1st Cir. 2008).  Here, Plaintiff alleges that he was forty five years old at the time of the adverse employment action.  (Docket 9-1 at 22 ¶ III.B.)  Further, he alleges that in his twelve years of working for the defendant companies, Plaintiff never received any negative comments, and his work was always praised.  (Id. ¶¶ 35, 38.)  He describes himself as a hard-working and dedicated employee who contributed to the economic growth of the companies.  (Id. ¶ 38.)

Plaintiff also alleges that his employer constructively discharged him.  (See id. ¶¶ 43, 79, 99.)  The standard governing constructive discharge in this circuit is that: "the trier of fact must be satisfied that the new working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign."  See Alicea Rosado v. Garcia Santiago, 562 F.2d 114, 119 (1st Cir. 1977).  This is an objective standard in which the focus is upon the reasonable state of mind of the putative discriminatee.  See Calhoun v. Acme Cleveland Corp., 798 F.2d 599, 560 (1st Cir. 1986).  As such, an employee may not be unreasonably sensitive to his or her working environment.  Id.

Plaintiff claims that his employers removed his responsibilities with respect to investments, lines of credit, and bank reconciliations, and by constantly telling him that they were going to terminate him or that he was better off leaving his employment.  (Docket No. 9-1 ¶¶ 43, 79, 99, 100.)  He alleges he was being dismissed by being deprived of his responsibilities.  (Id. ¶ 100.)

Civil No. 14-1722 (GAG)

Plaintiff also alleges facts of sexual harassment that show it is plausible that he was working in a hostile environment.   (See id. ¶¶ 90-93.)   Further, Plaintiff alleges that there were repeated inquiries and insinuations about his resignation, a reduction of salary, incidents of harassment, and an immediate replacement by a younger person.  (See id. ¶¶ 94, 102.)  Thus, the court, taking all of Plaintiff's allegations as true, finds that he has sufficiently pleaded facts that show it is plausible that his working conditions would have been so difficult or unpleasant that a reasonable person in the Plaintiff's shoes would have felt compelled to resign.

Additionally, in regards to the fourth prong, Plaintiff alleges that his position was immediately filled and that a young female was carrying out the duties of his position the day after he left his employment.  (Id. ¶ 37.)  This demonstrates that the employers maintained a need for someone to fill the position Plaintiff left vacant.  See Gutierrez-Lines v. P.R. Elec. & Power Auth., 751 F. Supp. 2d 327, 388 (D.P.R. 2010) (stating fourth prong satisfied when employer subsequently fills the position).

Therefore, at this stage, Plaintiff has sufficiently pleaded a plausible age discrimination claim under the ADEA.  Accordingly, the court hereby **DENIES** Defendants motion for judgment on the pleadings at Docket No. 29 as to Plaintiff's age discrimination claim.

ii.   <em>Retaliation Under the ADEA</em>

The court now turns to the plausibility of Plaintiff's retaliation claim under the ADEA.  As discussed above, Plaintiff's retaliation claim under the ADEA was timely filed in Plaintiff's original charge with the EEOC.  In addition to prohibiting age discrimination, the ADEA also protects individuals who invoke the statute's protections.  Ramírez-Rodríguez v. Boehringer Ingelheim Pharm., Inc., 425 F.3d 67, 84 (1st Cir. 2005) (citing 29 U.S.C. § 623(d)).  As such, even if Plaintiff's age discrimination claim fails; he may still assert a retaliation claim under the ADEA.

22

Civil No. 14-1722 (GAG)

1   Sanchez-Medina v. Unicco Serv. Co., No. 07-1880, 2010 WL 3955780 at *9 (D.P.R. Sept. 30

2   2010).   To satisfy the requirements for a retaliation claim under the ADEA, Plaintiff must show

3   that: (1) he engaged in ADEA-protected conduct; (2) he was thereafter subjected to an adverse

4   employment action; and (3) a causal connection existed between the protected conduct and the

5   adverse employment action.   See Fantini, 557 F.3d at 32 (citing Marrero v. Goya of P.R., Inc., 304

6   F.3d 7, 22 (1st Cir. 2002)); see also Bennett v. Saint-Gobain Corp., 507 F.3d 23, 32 (1st Cir.

7   2007).

8          As to the first prong, an individual engages in protected conduct when he or she has

9   opposed any practice made unlawful by the ADEA or has made a charge, testified, assisted, or

10   participated in any manner in an investigation, proceeding, or litigation under the ADEA.   See 29

11   U.S.C. § 623(d).   Because the analytical framework for ADEA discrimination and retaliation cases

12   was patterned after the framework for Title VII cases, the court will use Title VII case law to

13   determine whether Plaintiff's activity in this case is protected under the ADEA framework.   As

14   such, the precedent is largely interchangeable.   See  Hazel v. U.S. Postmaster Gen., 7 F.3d 1, 3-4

15   (1st Cir. 1993); see also Fantini, 557 F.3d at 32.   Under Title VII, the practice opposed by an

16   individual alleging a retaliation claim does not actually have to be in violation of Title VII, because

17   the plaintiff must demonstrate only that he or she had a good faith, reasonable belief that the

18   underlying challenged actions of the employer violated the law.   See Román-Oliveras, 655 F.3d at

19   51.   The Title VII opposition clause protects informal protests of discriminatory employment

20   practices, including making complaints to management, writing critical letters to customers,

21   protesting against discrimination by industry or by society in general, and expressing support of

22   co-workers who have filed formal charges.   Id.

23

24

Civil No. 14-1722 (GAG)

In the present case, as noted above, Plaintiff alleges that he was constructively terminated from his employment in retaliation for his expressed opposition against his employers' conduct in regards to López.  Plaintiff alleges that after López was fired, he filed a complaint in Federal Court under the ADEA and other statutes.  (Docket No. 9-1 ¶ 87.)  At some point after López filed his complaint, and the complaint was referred to Nolla's law firm, Nolla asked Plaintiff to sign statements in regards to López's case.  (Id.)  Plaintiff refused to do so, believing that the statements he was being asked to sign were untruthful.  (Id.)  Plaintiff also e-mailed Nolla, and copied employers on the e-mail, stating that Nolla's theory of López's case was far from the truth, and that he refused to endorse Nolla's theory and/or documents regarding López.  (Id. ¶ 88.)  Plaintiff also alleges that Nolla named Plaintiff as a witness in federal court for López's case, and Plaintiff again refused to participate.  (Id. ¶ 89.)  Further, in March, 2013, when Plaintiff received his second bonus, Nolla called Plaintiff and said that Plaintiff was now going to testify and "help us" since he should be happy now that he had received his bonus.  Id.  Plaintiff also alleges that Nolla participated in and encouraged his termination because Plaintiff opposed and refused to cooperate with the case against López.  (Id. at 23 ¶ III.D.)  Plaintiff alleges he was constructively terminated the following month.  (Id. ¶ 26.)  Thus, the court here finds that at this stage and taking Plaintiff's allegations as true, Plaintiff has sufficiently alleged that he engaged in ADEA-protected conduct by opposing his employers' actions against López.

With respect to the second prong of Plaintiff's retaliation claim under the ADEA (whether Plaintiff was thereafter subject to an adverse employment action), the court will focus on the facts Plaintiff alleges occurred between his protected activity and his alleged constructive discharge. The alleged time period is that he engaged in ADEA-protected activity around March, 2013, and was then constructively terminated in April, 2013.  (Id. ¶¶ 26, 87-89.)  As previously discussed,

Civil No. 14-1722 (GAG)

1    Plaintiff alleges that between those two dates, Nolla harassed him in respect to his participation in

2    the case against López.  (See id. ¶¶ 89-90.)  Plaintiff also alleges that he received a document from

3    Vizcarrondo-Carrión informing Plaintiff that his salary would be reduced by $400 per month.  (Id.

4    ¶ 7.)  Therefore, the court finds that Plaintiff sufficiently pleads facts to satisfy the second prong.

5         As to the third prong, Plaintiff has to make a colorable showing of a causal connection

6    between his protected activity (opposing cooperation with his employers in their case against

7    López) and the adverse employment action (the acts that Plaintiff alleges led to his constructive

8    dismissal).  See Bennett, 507 F.3d at 32.  Plaintiff has the burden of showing that he would not

9    have been constructively discharged but-for retaliatory animus.  See Univ. of Tex. Sw. Med. Ctr.

10   v. Nassar, 133 S. Ct. 2517, 2532-33 (2013) (requiring "but-for" causation under the similarly-

11   worded anti-retaliation provision of Title VII).  Plaintiff alleges that about a month passed between

12   Plaintiff's protected action and the date when he claims to have been constructively terminated.

13   (See Docket No. 9-1 ¶ 26.)   This temporal gap is sufficiently short so that, taking Plaintiff's

14   allegations as true, the court may infer a causal connection between the two.  Cf. Bishop v. Bell

15   Atl. Corp., 299 F.3d 53, 60 (1st Cir. 2002) (finding one-year gap between protected activity and

16   adverse employment action insufficient to support a reasonable inference of causation).  Moreover,

17   as explained above, the grievance filed by Plaintiff was directed at his employers, and included

18   Mr. Nolla.  (See Docket No. 29-1.)  Plaintiff specifically alleges that Nolla called Plaintiff to

19   confirm that Plaintiff would cooperate in the case against López.  (Docket No. 9-1 ¶ 89.)

20   Subsequently, Plaintiff specifically alleges that Nolla participated and encouraged Plaintiff's

21   termination because Plaintiff opposed and refused to cooperate with the case against López.  (Id. at

22   23.)  Thus, the court hereby finds at this stage that Plaintiff has alleged sufficient facts to establish

23

24

**Civil No. 14-1722 (GAG)**

that but-for Plaintiff's refusal to participate in the case against López, he would not have been constructively discharged by his employers.

As such, at this stage, Plaintiff has sufficiently pleaded a plausible retaliation claim under the ADEA.   Accordingly, the court hereby **DENIES** Defendants motion for judgment on the pleadings at Docket No. 29 as to Plaintiff's retaliation claim under the ADEA.

### IV.   Conclusion

In sum, Defendants' motion for judgment on the pleadings at Docket No. 29 is **GRANTED in part** and **DENIED in part** as follows.  Defendants' motion for judgment on the pleadings as to Plaintiff's claims against Defendants in their individual capacities under Title VII, the ADA, the ADEA, and Puerto Rico Law 80, and Plaintiff's claims under Law 115, 69, Title VII, § 703-704 of the ADA, and Law 17 of 1988 is hereby **GRANTED** and said claims are **DISMISSED with prejudice**.  Furthermore, Plaintiff's claims against both BPPR and Nolla are **DISMISSED with prejudice** entirely because said defendants are not Plaintiff's employers.  As such, the ADEA and Law 100 are not applicable to them.

However, Defendants' motion for judgment on the pleadings with respect to Plaintiff's age discrimination and retaliation claims under the ADEA is hereby **DENIED.**  Lastly, because the federal claims that give rise to federal jurisdiction in this case have not all been dismissed[7], the court **DENIES** Defendants' motion for judgment on the pleadings on Puerto Rico Law 100 at this time.

---

[7] At this time, the court acknowledges that Plaintiff alleges an ERISA claim in his complaint, but because Defendants fail to address said claim in their motion for judgment on the pleadings, the claim is sustained.

Civil No. 14-1722 (GAG)

1

**SO ORDERED.**

2

In San Juan, Puerto Rico this, 12th day of August, 2015.

3

4                                                         *s/ Gustavo A. Gelpí*
                                                          GUSTAVO A. GELPI
5                                                  United States District Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24